## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PATRICK GROOVER, Individually and on Behalf of All Others Similarly Situated,<br><br>             Plaintiff,<br><br>   v.<br><br>EQUIFAX INC., RICHARD F. SMITH and JOHN W. GAMBLE, JR.,<br><br>             Defendants. | Civil Action No.<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

By and through his undersigned counsel, Plaintiff Patrick Groover ("Plaintiff"), alleges the following against Equifax Inc. ("Equifax" or the "Company") and certain of the Company's executive officers and/or directors. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Equifax and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on Equifax's website concerning the Company's public statements; and (d) review of other publicly available information concerning Equifax and the Individual Defendants.

## NATURE OF THE ACTION

1.      This is a federal securities class action against Equifax and certain officers and/or directors for violations of the federal securities laws. Plaintiff brings this action on behalf of all persons or entities that purchased or otherwise acquired the publicly traded shares of Equifax common stock between February 25, 2016 and September 7, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Equifax is a global provider of information solutions and human resources business process outsourcing services for businesses, governments and consumers.

3.      Equifax maintains databases of consumer and business information derived from numerous sources including credit, financial assets, telecommunications and utility payments, employment, income, demographic and marketing data. The Company uses statistical techniques and proprietary software tools to analyze all data to create solutions and services for its clients.

4.      During the Class Period, Equifax made false and/or misleading statements and/or failed to disclose that: (1) the Company failed to maintain adequate measures to protect its data systems; (2) the Company failed to maintain adequate monitoring systems to detect security breaches; (3) the Company failed to maintain proper security systems, controls and monitoring systems in place; and (4) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

5.      On September 7, 2017, Equifax disclosed a cyber security incident involving consumer information impacting 143 million U.S. consumers.

6.     On release of the news, the Company's share price fell $24.09 per share, from a closing price on September 7, 2017 of $142.72 per share to a low of $118.63 per share on September 8, 2017, a drop of approximately 16.8%.

7.     On August 1 and 2, 2017, after the breach was discovered but before Equifax disclosed it, the Company's CFO and Individual Defendant Gamble, as well as two other executive officers, sold an aggregate amount of 12,229 of their shares for approximately $1.78 million.

## JURISDICTION AND VENUE

8.     The federal claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). The Company's securities trade on the New York Stock Exchange ("NYSE"), located within this District.

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, acquired Equifax common stock at artificially inflated prices during the Class Period, and suffered damages as a result.

13.     Defendant Equifax is incorporated in Georgia, with its principal executive offices located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309. Equifax trades on the NYSE under the ticker symbol "EFX."

14.     Richard F. Smith ("Smith") served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board at all relevant times.

15.     John W. Gamble, Jr. ("Gamble") served as the Company's Chief Financial Officer ("CFO") and Corporate Vice President at all relevant times.

16.     Defendants Smith and Gamble are collectively referred to as the "Individual Defendants."

17.     The Company and the Individual Defendants are collectively referred to herein as "Defendants."

18.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Equifax, were privy to confidential, proprietary and material adverse non-public information concerning Equifax, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the

Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Equifax's business.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

20.     Equifax was incorporated in 1913 in Georgia and is based in Atlanta, Georgia. Equifax is a global provider of information solutions and human resources business process outsourcing services for businesses, governments and consumers.

21.     Equifax maintains databases of consumer and business information derived from numerous sources including credit, financial assets, telecommunications and utility payments, employment, income, demographic and marketing data. The Company uses statistical techniques and proprietary software tools to analyze all data to create solutions and services for its clients.

22.     Equifax operates in four regions, namely: North America (U.S. and Canada), Asia Pacific (Australia and New Zealand), Europe (the United Kingdom, or U.K., Spain and Portugal) and Latin America (Argentina, Chile, Costa Rica, Ecuador, El Salvador, Honduras, Mexico, Paraguay, Peru and Uruguay).

23.     The Company divides its business results in four operating segments, as follows: U.S. Information Solutions (USIS), International, Workforce Solutions, and Global Consumer Solutions.

24.     Through the USIS segment, Equifax provides consumer and commercial information solutions to businesses in the U.S., including among others, online information and fraud and identity management services.

25.     Through the International segment, Equifax provides products and services similar to those available in the USIS operating segment but with variations by geographic region.

26.     Through the Workforce Solutions segment, Equifax provides services enabling clients to verify income and employment.

27.     Lastly, through the Global Consumer Solutions segment, Equifax provides products to consumers to help them monitor their credit and protect their identity. Equifax then sells the consumer and credit information to resellers.

### *Material Misstatements and Omissions during the Class Period*

28.     The Class Period begins on February 25, 2016. On February 24, 2016, after the market close, Equifax filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2015 ("2015 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. For the quarter, the Company reported unaudited revenue of $666.3 million, or $0.96 per diluted share, an increase in revenue of 7% compared to the previous year's comparable quarter. For the year, the Company reported revenue of $2.7 billion, or $3.55 per diluted share, an increase in revenue of 9% compared to the previous year.

29.   In addition, the 2015 10-K describes the Company's business strategy, notably, the continuous effort of Equifax to invest in security of its services:

**OUR BUSINESS STRATEGY**

Our strategic objective is to be the global leader in information solutions that creates unparalleled insights to solve customer challenges. Data is at the core of our value proposition. Leveraging our extensive resources, we deliver differentiated decisions through a broad and diverse set of data assets, sophisticated analytics and proprietary decisioning technology. Our long-term corporate growth strategy is driven by the following imperatives:

- **Deliver consistently strong profitable growth and shareholder returns.** We seek to meet or exceed our financial commitments on revenue growth and margins through disciplined execution of our strategic initiatives and by positioning ourselves as a premier provider of high value information solutions.

- **Develop unparalleled analytical insights leveraging Equifax unique data.** We continue to invest in and acquire unique sources of credit and non-credit information to enhance the variety and quality of our services while increasing clients' confidence in information-based business decisions. Areas of focus for investment in new sources of data include, among others, positive payment data, real estate data and new commercial business data. We also have developed unique capabilities to integrate customer and third-party data into our solution offerings to further enhance the decisioning solutions we develop for our customers.

***We continue to invest in and develop new technology to enhance the functionality, cost-effectiveness and security of the services we offer and further differentiate our products from those offered by our competitors.*** In addition to custom products for large clients, we develop off-the-shelf, decisioning technology platforms that are more cost effective for medium and smaller-sized clients. We also develop predictive scores and analytics, some of which leverage multiple data assets, to help clients acquire new customers and manage their existing customer relationships. We develop a broad array of industry, risk management, cross-sell and account acquisition models to enhance the precision of our clients' decisioning activities. We also develop custom and generic solutions that enable customers to more effectively manage their debt collection and recovery portfolios.

\*      \*      \*

- **Serve as a trusted steward and advocate for our customers and consumers.** This includes continuously improving the customer and consumer experience in our consumer and commercial offerings, anticipating and executing on regulatory initiatives**, *while simultaneously delivering security for our services*.**

(Emphases added.)

30.     On February 23, 2017, Equifax filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2016 ("2016 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. For the quarter, the Company reported unaudited revenue of $801.1 million, or $1.01 per diluted share, an increase in revenue of 20% compared to the previous year's comparable quarter. For the year, the Company reported revenue of $3.1 billion, or $4.04 per diluted share, an increase in revenue of 18% compared to the previous year.

31.     The 2016 10-K provides a similar description of the Company's business strategy and the continuous effort of Equifax to invest in security of its services:

### OUR BUSINESS STRATEGY

Our strategic objective is to be the global leader in information solutions that creates unparalleled insights to solve customer challenges. Data is at the core of our value proposition. Leveraging our extensive resources, we deliver differentiated decisions through a broad and diverse set of data assets, sophisticated analytics and proprietary decisioning technology. Our long-term corporate growth strategy is driven by the following imperatives:

- **Deliver consistently strong profitable growth and shareholder returns**. We seek to meet or exceed our financial commitments on revenue growth and margins through disciplined execution of our strategic initiatives and by positioning ourselves as a premier provider of high value information solutions.

- **Develop unparalleled analytical insights leveraging Equifax unique data**. We continue to invest in and acquire unique sources of credit and non-credit information to enhance the variety and quality of our services while increasing clients' confidence in information-based business decisions. Areas of focus for investment in new sources of data include, among others, positive payment data, fraud and personal identification data, real estate data and new commercial business data. We also have developed unique capabilities to integrate customer and third-party data into our solution offerings to further enhance the decisioning solutions we develop for our customers.

*We continue to invest in and develop new technology to enhance the functionality, cost-effectiveness and security of the services we offer and further differentiate our products from those offered by our competitors*. In addition to custom products for large clients, we develop software as a service based, decisioning and data access technology platforms that are more cost effective for clients of all sizes. We also develop predictive scores and analytics, some of which leverage multiple data assets, to help clients acquire new customers and manage their existing customer relationships. We develop a broad array of industry, risk management, cross-sell and account acquisition models to enhance the precision of our clients' decisioning activities. We also develop custom and generic solutions that enable customers to more effectively manage their debt collection and recovery portfolios.

*       *       *

- **Serve as a trusted steward and advocate for our customers and consumers**. This includes continuously improving the customer and consumer experience in our consumer and commercial offerings, anticipating and executing on regulatory initiatives, *while simultaneously delivering security for our services.*

(Emphases added.)

32. On April 26, 2017 Equifax issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC, announcing the Company's financial and operating results the first fiscal quarter and six months ended March 31, 2017 ("Q1 2017 Press Release"). For the quarter, the Company reported unaudited revenue of $832.2 million, or

$1.26 per diluted share, an increase in revenue of 14% compared to the previous year's comparable quarter.

33.     On April 27, 2017, Equifax filed a Form 10-Q with the SEC announcing the Company's financial and operating results for the first fiscal quarter ended March 31, 2017 ("Q1 2017 10-Q"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. Throughout the Q1 2017 10-Q, the company reapproved the previous statements. In addition, Equifax disclosed an increase in capital expenditures which, among others purposes, served to improve "system reliability, security and disaster recovery enhancements." In relevant part:

*Investing Activities*

**Capital Expenditures**

| Net cash used in: | Three Months Ended March 31, | | Change 2017 vs. 2016 |
|---|---|---|---|
| | **2017** | **2016** | |
| | *(In millions)* | | |
| Capital expenditures* | $   (50.3) | $   (40.2) | $   (10.1) |

*Amounts above include cash outflows for capital expenditures.

***Our capital expenditures are used for developing, enhancing and deploying new and existing software in support of our expanding product set, replacing or adding facilities and equipment, updating systems for regulatory compliance, the licensing of software applications and investing in system reliability, security and disaster recovery enhancements.*** Capital expenditures in the first three months of 2017 increased by $10.1 million from the same period in 2016 as we paid amounts that were accrued as of December 31, 2016.

(Emphasis added.)

34.     On July 26, 2017, Equifax issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC, announcing the Company's financial and operating results for the second fiscal quarter and six months ended June 30, 2017 ("Q2 2017 Press Release"). For the

quarter, the Company reported unaudited revenue of $856.7 million, or $1.36 per diluted share, an increase in revenue of 6% compared to the previous year's comparable quarter. Throughout the press release, the Company disclosed strong revenue growth driven by identity and fraud solutions. In relevant part:

**Strong execution, revenue growth and margin expansion drive double-digit EPS growth**

- Revenue of $856.7 million was up 6 percent (7 percent in local currency) compared to the second quarter of 2016.
- Diluted EPS of $1.36 was up 26 percent compared to the second quarter of 2016.
- Adjusted EPS of $1.60 was up 12 percent compared to the second quarter of 2016.
- Net income attributable to Equifax of $165.4 million was up 26 percent compared to the second quarter of 2016.
- Adjusted EBITDA margin was 39.1 percent compared to 36.6 percent in the second quarter of 2016.

**ATLANTA, July 26, 2017** -- Equifax Inc. (NYSE: EFX) today announced financial results for the quarter ended June 30, 2017.

"Second quarter performance reflects outstanding execution by the team and the strength of our unique portfolio of businesses," said Richard F. Smith, Chairman and Chief Executive Officer at Equifax. "The team continues to make significant progress on new product innovation and our enterprise growth initiatives, both in the U.S. and around the world. We remain confident in our outlook for 2017 and are optimistic about the opportunities in front of us as we look ahead to 2018."

<u>**Financial Results Summary**</u>

The company reported revenue of $856.7 million in the second quarter of 2017, a 6 percent increase compared to the second quarter of 2016 on a reported basis and up 7 percent on a local currency basis.

Second quarter diluted EPS attributable to Equifax was $1.36, up 26 percent compared to the second quarter of 2016. Adjusted EPS attributable to Equifax was $1.60, up 12 percent compared to the second quarter of 2016. This financial measure for 2017 excludes the income tax effects of stock awards recognized upon vesting or settlement and for 2016 excludes Veda acquisition related amounts. The financial measure for both 2017

and 2016 excludes acquisition-related amortization expense, net of associated tax impacts. These items are described more fully in the attached Q&A.

Net income attributable to Equifax of $165.4 million was up 26 percent compared to the second quarter of 2016. Adjusted EBITDA margin is 39.1 percent, compared to 36.6 percent in the second quarter of 2016. These financial measures for 2017 and 2016 have been adjusted for certain items, which affect the comparability of the underlying operational performance and are described more fully in the attached Q&A.

***USIS delivered strong revenue growth driven by mortgage, marketing and analytic services, and identity and fraud solutions.***

- Total revenue was $331.9 million in the second quarter of 2017 compared to $307.9 million in the second quarter of 2016, an increase of 8 percent. Operating margin for USIS was 45.1 percent in the second quarter of 2017 compared to 43.5 percent in the second quarter of 2016. Adjusted EBITDA margin for USIS was 51.5 percent in the second quarter of 2017 compared to 50.4 percent in the second quarter of 2016.
- Online Information Solutions revenue was $232.6 million, up 6 percent compared to the second quarter of 2016.
- Mortgage Solutions revenue was $38.6 million, up 10 percent compared to the second quarter of 2016.
- Financial Marketing Services revenue was $60.7 million, up 15 percent compared to the second quarter of 2016.

\*       \*       \*

**Third Quarter 2017 and Full Year 2017 Outlook**

We are off to a strong start through the first half of 2017. For the third quarter, at current exchange rates, we expect revenue to be between $853 and $861 million, reflecting growth of 6-7%, with limited foreign exchange impact. Adjusted EPS is expected to be between $1.50 and $1.54 which is up 4% to 7%, also with limited foreign exchange impact.

We expect full year 2017 revenue to be between $3.395 and $3.425 billion, reflecting constant currency growth of approximately 9%. Adjusted EPS for the year is expected to be between $6.02 and $6.10, which is up approximately 10%.

(Emphasis added.)

35.     On July 27, 2017, Equifax filed a Form 10-Q with the SEC announcing the Company's financial and operating results for the second fiscal quarter ended June 30, 2017 ("Q2 2017 10-Q"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. Throughout the Q2 2017 10-Q the company reapproved the previous statements. Similarly, Equifax disclosed an increase in capital expenditures, stating in relevant part:

### *Investing Activities*

## Capital Expenditures

| | Six Months Ended June 30, | | Change |
|---|---|---|---|
| Net cash used in: | 2017 | 2016 | 2017 vs. 2016 |
| | *(In millions)* | | |
| Capital expenditures* | $(99.9) | $(82.8) | $   (17.1) |

*Amounts above are total cash outflows for capital expenditures.

> ***Our capital expenditures are used for developing, enhancing and deploying new and existing software in support of our expanding product set, replacing or adding facilities and equipment, updating systems for regulatory compliance, the licensing of software applications and investing in system reliability, security and disaster recovery enhancements.*** Capital expenditures in the first six months of 2017 increased by $17.1 million from the same period in 2016 as we paid amounts that were accrued as of December 31, 2016.

(Emphasis added.)

36.     The statements in paragraphs 28-35 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading

statements and/or failed to disclose that: (1) the Company failed to maintain adequate measures to protect its data systems; (2) the Company failed to maintain adequate monitoring systems to detect security breaches; (3) the Company failed to maintain proper security systems, controls and monitoring systems in place; and (4) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

### The Truth Emerges

37.     On September 7, 2017, after the market close, Equifax issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC, announcing a cyber security incident involving unauthorized access to consumer information. The press release stated in pertinent part:

> **Equifax Announces Cybersecurity Incident Involving Consumer Information**
>
> **No Evidence of Unauthorized Access to Core Consumer or Commercial Credit Reporting Databases**
>
> **Company to Offer Free Identity Theft Protection and Credit File Monitoring to All U.S. Consumers**
>
> ***Equifax Inc. (NYSE: EFX) today announced a cybersecurity incident potentially impacting approximately 143 million U.S. consumers.*** Criminals exploited a U.S. website application vulnerability to gain access to certain files. ***Based on the company's investigation, the unauthorized access occurred from mid-May through July 2017. The company has found no evidence of unauthorized activity on Equifax's core consumer or commercial credit reporting databases.***
>
> ***The information accessed primarily includes names, Social Security numbers, birth dates, addresses and, in some instances, driver's license numbers. In addition, credit card numbers for approximately 209,000 U.S. consumers, and certain dispute documents with personal identifying information for approximately 182,000 U.S. consumers, were accessed.*** As part of its investigation of this application vulnerability, Equifax also identified unauthorized access to limited personal information for certain UK and Canadian residents. Equifax will work with UK and Canadian regulators to determine appropriate

next steps. The company has found no evidence that personal information of consumers in any other country has been impacted.

Equifax discovered the unauthorized access on July 29 of this year and acted immediately to stop the intrusion. The company promptly engaged a leading, independent cybersecurity firm that has been conducting a comprehensive forensic review to determine the scope of the intrusion, including the specific data impacted. Equifax also reported the criminal access to law enforcement and continues to work with authorities. While the company's investigation is substantially complete, it remains ongoing and is expected to be completed in the coming weeks.

"This is clearly a disappointing event for our company, and one that strikes at the heart of who we are and what we do. I apologize to consumers and our business customers for the concern and frustration this causes," said Chairman and Chief Executive Officer, Richard F. Smith. "We pride ourselves on being a leader in managing and protecting data, and we are conducting a thorough review of our overall security operations. We also are focused on consumer protection and have developed a comprehensive portfolio of services to support all U.S. consumers, regardless of whether they were impacted by this incident."

Equifax has established a dedicated website, www.equifaxsecurity2017.com, to help consumers determine if their information has been potentially impacted and to sign up for credit file monitoring and identity theft protection. The offering, called TrustedID Premier, includes 3-Bureau credit monitoring of Equifax, Experian and TransUnion credit reports; copies of Equifax credit reports; the ability to lock and unlock Equifax credit reports; identity theft insurance; and Internet scanning for Social Security numbers - all complimentary to U.S. consumers for one year. The website also provides additional information on steps consumers can take to protect their personal information. Equifax recommends that consumers with additional questions visit www.equifaxsecurity2017.com or contact a dedicated call center at 866-447-7559, which the company set up to assist consumers. The call center is open every day (including weekends) from 7:00 a.m. - 1:00 a.m. Eastern time.

In addition to the website, Equifax will send direct mail notices to consumers whose credit card numbers or dispute documents with personal identifying information were impacted. Equifax also is in the process of contacting U.S. state and federal regulators and has sent written notifications to all U.S. state attorneys general, which includes Equifax contact information for regulator inquiries.

> Equifax has engaged a leading, independent cybersecurity firm to conduct an assessment and provide recommendations on steps that can be taken to help prevent this type of incident from happening again.
>
> CEO Smith said, "I've told our entire team that our goal can't be simply to fix the problem and move on. Confronting cybersecurity risks is a daily fight. While we've made significant investments in data security, we recognize we must do more. And we will."

(Emphases added.)

38.     On release of the news, the Company's share price fell $24.09 per share, from a closing price on September 7, 2017 of $142.72 per share to a low of $118.63 per share on September 8, 2017, a drop of approximately 16.8%.

## CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those that purchased or otherwise acquired the publicly traded shares of Equifax common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

40.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Equifax's securities were actively traded on the NYSE (an open and efficient market) under the symbol "EFX." While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. As of July 13, 2017, the Company had over 120 million shares outstanding. Millions of Equifax shares were traded publicly during the Class Period on the NYSE. Record owners and the other

members of the Class may be identified from records maintained by Equifax or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.   Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

43.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether Defendants participated in and pursued the common course of conduct complained of herein;

(c)   whether documents, press releases, and other statements disseminated to the investing public with the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Equifax;

(d)   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Equifax;

17

(e)     whether the market price of Equifax common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)     to what extent the members of the Class have sustained damages and the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

45.     The market for Equifax common stock was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Equifax common stock traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired Equifax common stock relying upon the integrity of the market price of the Company's securities and market information relating to Equifax, and have been damaged thereby.

46.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Equifax's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially

false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Equifax's business, operations, and prospects as alleged herein.

47.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Equifax's well-being and prospects.

48.    These material misstatements and/or omissions had the effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

49.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Equifax common stock and operated as a fraud or deceit on Class Period purchasers of Equifax common stock by failing to disclose to investors that the Company's public statements were materially misleading and misrepresented material information. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Equifax's common stock fell precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of Equifax's common

stock during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e. damages, under the federal securities law.

50.     Because of the failure to disclose the Company's business prospects and operations, investors were not aware of the true state of the Company's financial status. Instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Equifax to conceal the truth and thus presented a misleading picture of Equifax's business and prospects.

51.     Defendants' false and misleading statements caused Equifax's common stock to trade at artificially inflated levels throughout the Class Period. As a direct result of the Company's problems coming to light, Equifax's common stock price fell precipitously from its Class Period high. The stock price drop discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

52.     The decline in the price of Equifax's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Equifax's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Equifax's securities and the subsequent decline in the value of Equifax's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## SCIENTER ALLEGATIONS

53.     On August 1 and 2, 2017, after the breach was discovered but before Equifax disclosed it, the Company's CFO and Individual Defendant Gamble, as well as two other executive officers, sold an aggregate amount of 12,229 of their own Equifax shares for approximately $1.78 million.

54.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Equifax, their control over, and/or receipt and/or modification of Equifax's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Equifax, participated in the fraudulent scheme alleged herein.

55.     The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

56.     At all relevant times, the market for Equifax's common stock was an efficient market for the following reasons, among others:

(a)   Equifax stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   as a regulated issuer, Equifax filed periodic public reports with the SEC and/or the NYSE;

(c)   Equifax regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)   Equifax was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

57.   As a result of the foregoing, the market for Equifax's securities promptly digested current information regarding Equifax from all publicly available sources and reflected such information in Equifax's stock price. Under these circumstances, all purchasers of Equifax common stock during the Class Period suffered similar injury through their purchase of Equifax common stock at artificially inflated prices, and a presumption of reliance applies.

58.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Equifax's business practices, financial

results and condition and internal controls -- information that Defendants were obligated to disclose during the Class Period but did not -- positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## NO SAFE HARBOR

59.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

60.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Equifax who knew that the statement was false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against All Defendants)

61.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein. This claim is asserted against all Defendants.

62.    During the Class Period, Equifax and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Equifax common stock; and (iii) cause Plaintiff and the other members of the Class to acquire or otherwise purchase Equifax stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

63.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's Securities in an effort to maintain artificially high market prices for Equifax securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein.

64.    In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or their participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the

integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

65.    65. Equifax and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Equifax as specified herein. These Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Equifax's value and performance and substantial growth. This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Equifax and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein. Defendants engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Equifax's securities during the Class Period.

66.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or

director of the Company, was privy to and participated in the creation, development, and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with one another, and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

67.    These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Equifax's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

68.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Equifax's common stock was artificially inflated during the Class Period. Unaware of the fact

that market prices of Equifax's publicly-traded securities were artificially inflated, and relying directly or indirectly on the misrepresentations and omissions by Defendants, or upon the integrity of the market in which the Securities trade, Plaintiff and the other members of the Class acquired Equifax's Securities during the Class Period at artificially high prices and were or will be damaged thereby.

69.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were unaware of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Equifax's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Equifax securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

70.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

71.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's Securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

72.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

73.     The Individual Defendants acted as controlling persons of Equifax within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

74.    In addition, each of the Individual Defendants had direct involvement in the day- to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

75.    As set forth above, Equifax and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.      Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.      Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

D.      Awarding such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated:   September 18, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
            ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I, __PATRICK GROOVER__, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against Equifax, Inc. ("Equifax" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Equifax securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Equifax securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Equifax securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed _____9/14/17_____

             **(Date)**

                                    **(Signature)**

                          PATRICK GROOVER

                          **(Type or Print Name)**

**EQUIFAX INC. (EFX)**                                                                                  **Groover, Patrick**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|------|------------------|------------------------|------------------------|
| 2/3/2017 | Purchase | 50 | $120.3177 |
| 8/7/2017 | Purchase | 38 | $144.8255 |